Nicole Lewis (State Bar No. 217237)
Rebecca Horne (Pro Hac Vice to be submitted)
**LawHQ, LLC**
299 S. Main St. #1300
Salt Lake City, UT 84111
Phone: (385) 233-6612 ext. 3152
nicole.lewis@lawhq.com
rebecca@lawhq.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **William Cain, et al,**<br><br>Plaintiffs,<br><br>v.<br><br>**Porch.com Inc.,** a Delaware corporation; **GoSmith Inc.** a Delaware corporation**; Matthew Ehrlichman**, CEO and co-founder of Porch.com Inc. and CEO of GoSmith, Inc., in his individual capacity; **Brenton Marrelli**, CEO and co-founder of GoSmith Inc., in his individual capacity; and **Darwin Widjaja,** CTO and co-founder of GoSmith Inc. and VP of Porch.com Inc., in his individual capacity,<br><br>Defendants | Civil Case No.:<br><br>**JURY TRIAL DEMANDED** |

## Introduction

This is a lawsuit against one of the most blatant and egregious telephone spam operations being perpetuated by telemarketers today. The named Defendants have sent a flood of unsolicited text messages to contractors nationwide. These contractors have complained of Defendants' invasive and aggressive telemarketing in online forums around the nation and even

Complaint

in an FCC consumer complaint. In the present case, 330 Plaintiffs collectively bring suit to hold Defendants accountable for their illegal telemarketing.

Willaim Cain and 329 other individuals ("Plaintiffs") bring this action seeking to enforce Plaintiffs' rights to privacy under the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The TCPA is a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices.  See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). The legislative history of the bill's inception shows how seriously Congress took the people's mandate to protect their privacy, calling robocalls "the scourge of modern civilization," and stating that "[c]onsumers around the country are crying out for Congress to put a stop to these [calls]."  Senator Hollings (SC), "Automated Telephone Consumer Protection Act," *Congressional Record*, 137 Cong. Rec. at S16205 (November 7, 1991) 1991 WL 229525. Available from Westlaw, last accessed on October 16, 2019.

Porch.com Inc, GoSmith Inc, Matthew Ehrlichman, Darwin Widjaja, and Brenton Marrelli ("Defendants") have blatantly violated the TCPA by using an automatic telephone dialing system, or "ATDS", to send telemarketing text messages to Plaintiffs' cellular telephone numbers for the purposes of advertising their goods and services. Further violating the TCPA, Defendants have sent thousands of text messages to Plaintiffs despite many of the Plaintiffs' presence on the National Do Not Call Registry.

Plaintiffs have standing under the TCPA to bring this action before the Court, which Plaintiffs now do, and respectfully request relief.

## I.  Parties

1. There are 330 Plaintiffs in this lawsuit, each of whom is a "person" as defined by 47 U.S.C. § 153 (39). For the name, county, and state of each Plaintiff, see Exhibit A.

2. Defendant Porch.com ("Porch.com") is a Delaware corporation with its principal place of business at 2201 1st Ave. S. Seattle, WA 98134.

3. Defendant GoSmith, Inc. ("GoSmith") is a Delaware corporation with its principal place of business at 1250 Borregas Ave, Sunnyvale, CA 94089.

4. Defendant Matthew Ehrlichman ("Ehrlichman") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of King County, Washington.

5. Defendant Brenton Marrelli ("Marrelli") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of San Mateo County, California.

6. Defendant Darwin Widjaja ("Widjaja") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of Alameda County, California.

## II.  Jurisdiction and Venue

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as the action arises under the TCPA, which is a federal statute.

8. Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced, and Defendants' contacts with this District are sufficient to subject them to personal jurisdiction. *See* 28 U.S.C. § 1391.

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, as GoSmith is the entity sending the text messages and is located in this District.

### III. Statement of Facts Common to All Claims

10. Defendants have sent 61,680 text messages to Plaintiffs using an ATDS. *See* Exhibit A.

11. Defendants have sent 23,344 text messages to Plaintiffs' phone numbers on the National Do Not Call Registry. *See* Exhibit A.

12. Here are two examples of Defendants' text messages to William Cain (left) and Gabe Nuñez (right).



13. Defendants' text messages were for the purpose of telemarketing.

14. Defendants knowingly and willfully sent the text messages to Plaintiffs via an ATDS, as defined by 47 U.S.C. § 227(a)(1), which has the capacity to store numbers to be called and to dial such numbers.

15. The system Defendants used is also a predictive dialer, automatically sending new messages based off of an algorithm and formula.

16. The sheer volume of text messages clearly indicate that Defendants used an ATDS.

17. Volume aside, the manner in which Defendants wrote and responded to the text messages unequivocally show that an automated system—and not a human—sent the messages.

18. A human who manually sends and responds to a text message conversation does not tell someone "Reply 1 if interested, 3 if not." Rather, these numbers are codes for an automated system to receive a response, interpret the message, and automatically respond.

19. In the two examples above, when William Cain and Gabe Nuñez responded with "3" and then with "9", Defendants answered with the exact same message each time.

20. Yet, when contractors sent a message that was not a code such as "1" or "3", Defendants never replied. Here are three examples from William Cain (left), Armando Crespin (right), and Randy Landman (bottom):



Complaint



21. If a human were manually sending and responding to the text messages—as opposed to an automated system—Defendants would have responded to these messages because the messages were coming from a responsive and inquiring potential new client.

22. Plaintiffs never provided Defendants with their cellular telephone number, and never agreed to receive any text messages or phone calls from Defendants.

23. Rather, Defendants obtained Plaintiffs' information and telephone numbers by scraping websites such as Yelp, Angie's List, and Yellow Pages. Thus, at no time did Plaintiffs provide Defendants or Defendants' agents with prior express written consent to receive unsolicited text messages, pursuant to 47 U.S.C. § 227(b)(1)(A).

24. Marrelli and Widjaja, as the co-founders of GoSmith, personally created, set up, ran, and oversaw GoSmith's marketing from its inception.

25. On LinkedIn, Marrelli lists himself as the CEO of GoSmith (2012 - Present), and Widjaja lists himself as the CTO of GoSmith (2012 - Present). *See* https://www.linkedin.com/in/brentonmarrelli/ and https://www.linkedin.com/in/darwinwidjaja/, last accessed on January 30, 2020 2:25 p.m. MST.

26. Widjaja shares on his LinkedIn profile that: "My co-founder and I bootstrapped the company and in 5 years, we were able to grow the service to cover nationwide and reaching

$10M in annual revenue. Prior to an acquisition by Porch.com in January 2017, I was building and managing a team of engineers, designer [sic] and customer success managers." *See* https://www.linkedin.com/in/darwinwidjaja/, last accessed on January 30, 2020 2:25 p.m. MST.

27. Marrelli and Widjaja, as the co-founders and CEO/CTO of GoSmith, have been directly involved in the strategy, approval, set up, and execution of the telemarketing campaigns referenced in this complaint which have violated the TCPA.

28. Both Marrelli and Widjaja are involved in nearly every facet of GoSmith's operations and have comprehensive personal knowledge of GoSmith's business model and internet operations.

29. After the acquisition in January 2017, GoSmith became a wholly-owned subsidiary of Porch.com.

30. GoSmith's foreign business filing in Washington shows Ehrlichman and Marrelli as GoSmith's Governors. GoSmith's foreign business filing in California shows Ehrlichman as GoSmith's CEO.

31. As the CEO and Governor of GoSmith, Ehrlichman has also been directly involved in the strategy and continued approval of the telemarketing campaigns referenced in this complaint which have violated the TCPA.

32. Marrelli, Widjaja, and Ehrlichman have been actual participants in these TCPA torts because they have personally authorized, overseen, and directed the illegal telemarketing. Each of them is therefore personally liable as tort participants.

33. In the past three years, GoSmith has been sued 10 times for TCPA violations. In each lawsuit, Marrelli, Widjaja, and Ehrlichman have been given actual and constructive notice that GoSmith's telemarketing is problematic and illegal, yet they defend and continue to

authorize GoSmith's telemarketing. Each of them is therefore personally liable as tort participants.

34. GoSmith is the alter ego of Porch.com and therefore Porch.com is liable for GoSmith's illegal text messages.

35. There is such a unity of interest between GoSmith and Porch.com that the separate personalities of GoSmith and Porch.com no longer exist.  This is evidenced by following facts:

  a. GoSmith is inadequately capitalized. GoSmith intentionally and wilfully exposes itself to hundreds of millions of dollars in TCPA violations with no sufficient means to pay for these liabilities.

  b. GoSmith and Porch.com have commingled their assets. Here are just four examples of their commingling:

     i. First, at https://forum.nachi.org/t/porch-gosmith/120546, a user named Vince Del Fine reported in December 2017: "I received a lead from both [Porch.com and GoSmith] and it's the same client. Not the first time either." To this, another user named Frank Rotte responded, "I believe they are one in [sic] the same. I signed up with Porch as a client looking for a home inspection, and received a text from Smith, as the inspector, asking if I was interested in the job." *Id.*

     ii. Second, GoSmith sometimes sends contractors text messages that contain URLs to GoSmith's website. If a contractor clicks one of the URLs, the contractor will automatically be logged into an online dashboard, and can see this message:



    iii. Third, if you view the data that loads behind the scenes when accessing the contractor dashboard, you can see that GoSmith saves multiple fields of data for each contractor, including two fields that relate to Porch.com. The first is a field called "PorchMigrationState," which indicates whether GoSmith has migrated the contractor to Porch.com. The second is a field called "PorchCompanyID," which references the company identifier that Porch.com uses for that contractor.

    iv. Fourth, some of the text messages GoSmith has sent come from the numbers 650-250-7911 and 650-250-7913. CNAM is an authoritative database that the phone companies use to identify the name associated with a telephone number. A CNAM lookup on the two numbers above returns the name "Porchcom Inc." In other words, GoSmith is sending text messages using Porch.com's telemarketing infrastructure.

c. As GoSmith says in the "Important announcement" screenshot above, GoSmith is closing its doors 1/31/2020. *See supra* at 8:35.b.ii. Once GoSmith closes its doors,

  it presumably will halt operations and sell or transfer away any remaining assets, leaving a total absence of corporate assets.

  d. GoSmith is the mere instrumentality of Porch.com for a single venture. This is readily seen in the examples above regarding commingling of assets. Porch.com uses GoSmith to expand its contractor network, and GoSmith is funneling all of their contractors to Porch.com. The purpose of this single venture is to build a single, massive network of diverse contractors nationwide.

  e. Porch.com has used GoSmith as a subterfuge for illegal transactions. The messages GoSmith sends violate the TCPA. After 10 TCPA class actions have been brought against them in the last three years, Porch.com must have actual and/or constructive knowledge that GoSmith's telemarketing is illegal. But Porch.com continues to spam contractors through GoSmith because doing so allows Porch.com to escape the legal consequences.

  f. Porch.com and GoSmith have identical officers. On LinkedIn, Widjaja not only lists himself as the CTO of GoSmith, but also as a VP of Porch.com. Additionally, Erhlichman is the CEO Porch.com *and* the CEO of GoSmith.

  g. Both Porch.com and GoSmith employ attorneys from Manatt, Phelps & Phillips, LLP.

36. Porch has had actual and/or constructive knowledge of GoSmith's blatant TCPA violations. Porch.com has allowed GoSmith to continue to spam because of the benefit to Porch.com's own contractor network. Porch's conduct has clearly been in bad faith. To allow Porch.com to hide behind GoSmith's corporate veil would be unfair, unjust, and inequitable.

37. By texting Plaintiffs, Defendants harmed Plaintiffs in the exact way that Congress sought to prevent by enacting the TCPA.

38. Plaintiffs have suffered lost time, an annoyance, a nuisance, and an invasion of privacy because of the text messages.

### IV. Legal Standard

39. In 1991, Congress passed the TCPA to regulate the explosive growth of the telemarketing industry. In doing so, Congress recognized that "[u]nrestricted telemarketing. . . can be an intrusive invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

#### i. *The National Do Not Call Registry*

40. Congress, via the TCPA, authorized a rulemaking proceeding to explore how to best protect "telephone subscribers' privacy rights." 47 U.S.C. § 227(c)(1).

41. The end result of the rulemaking proceeding was the creation of the National Do Not Call Registry ("Registry"). The Registry is a single national database where people can register their telephone numbers and thereby indicate their desire not to receive telephone solicitations. Telephone solicitations to numbers on the Registry are prohibited. 47 C.F.R. §64.1200(c)(2).

#### ii. *Prohibitions on Automated, Artificial, and Prerecorded Telemarketing Calls*

42. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii).

43. The TCPA defines an "automatic telephone dialing system" ("ATDS") as "equipment that has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

44. The 9th Circuit has explained that the statutory definition of an ATDS means "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. Sep. 20, 2018).

45. The Federal Communication Commission ("FCC") has also found that predictive dialers constitute an ATDS. See *In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14093 (2003); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008).

46. In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express **written** consent" for such calls to wireless numbers. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1838 [8] ¶¶18, 20 (February 15, 2012) (emphasis supplied).

47. To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent. . . . [and] having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *Id* at 1843 [13] ¶32 (citing the FTC's rules for telemarketing calls, codified at 16 C.F.R. § 310.4(b)(v)(A)(i), (iii), (iv).

48. The TCPA regulations promulgated by the FCC define "telemarketing" as the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).

49. The FCC and courts have expanded the protections of the TCPA to text messages. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

### iii. *Individual Officer Liability*

50. Under the TCPA, an individual may be personally liable pursuant to 47 U.S.C. § 217, which provides that the "act, omission, or failure… of any officer… acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure… of such carrier or user as well as of that person." 47. U.S.C. § 217.

51. To violate the TCPA is to commit a tort, and a "corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Donsco, Inc. v. Casper Corp.*, 587 F. 2d 602 (3d Cir. 1978).

52. When considering individual officer liability, Courts have agreed that a corporate officer involved in the telemarketing may be personally liable under the TCPA. *See*, e.g., *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, (3d Cir. 2018) ("[A] corporate officer can face personal liability under the TCPA for actions he personally authorized or took.")(J. Schwartz, concurring in the majority opinion, which reads: "a corporate officer can be personally liable [under the TCPA] if he . . . actively oversaw and directed the conduct."); *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually

liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

    iv.   **Alter Ego Liability**

53. Under California law, a subsidiary is the alter ego of its parent corporation—and the parent corporation is therefore liable for the subsidiary's acts—when the following two conditions are met: "(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal. App.4th 1269, 1285, 31 Cal.Rptr.2d 433. See also *Schwarzkopf v. Brimes*, 626 F.3d 1032, 1038 (9th Cir. 2010).

54. No single factor is necessary or sufficient to find alter ego liability. *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal. App.2d 825, 840.

55. A unity of interest arises when there is, inter alia, inadequate capitalization, commingling of assets, the total absence of corporate assets, the use of a corporation as a mere instrumentality for a single venture, use of a corporation as a subterfuge for illegal transactions, identical officers, and employment of the same attorneys. *Id.* at 838–840.

56. An inequitable result arises when a parent corporation uses its subsidiary to engage in "conduct amounting to bad faith" and then seeks to "hide behind [the] corporate veil" of its subsidiary. *Id.* at 842.

    v.   **Standing Under the TCPA**

57. The TCPA provides two separate private right of actions under 227(b) and 227(c). *See* 47 U.S.C. § 227(b)(3); 47 U.S.C. § 227(c)(5).

58. There is a private right of action for persons who receive automated calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

59. There is also a private right of action for persons whose phone numbers are on the Registry that receive "more than one telephone call within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. § 227(c)(5).

60. In an action under 227(b), a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), aff'd, 755 F.3d 1265 (11th Cir. 2014).

61. A plaintiff alleging a violation under the TCPA "need not allege any additional harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)).

62. The receipt of a telemarketing or unsolicited call "demonstrates more than a bare violation and satisfies the concrete-injury requirement for standing." *Leyse v. Lifetime Entm't Servs., LLC*, Nos. 16-1133-cv, 16-1425-cv, 2017 U.S. App. LEXIS 2607 (2d Cir. 2017) (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) ("The injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice."); *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 819–21 (8th Cir. 2015) (holding that receipt of two brief unsolicited robocalls as voicemail messages was sufficient to establish standing under TCPA).

## V. First Cause of Action:

### Illegal Use of an ATDS

63. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

64. The Defendants' use of an ATDS to contact Plaintiffs constitutes a violation of 47 U.S.C. § 227(b).

65. As a result of Defendants' negligent violations of 47 U.S.C. § 227(b), Plaintiffs are entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

66. As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiffs are entitled to an award of $1,500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

67. Plaintiffs are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## VI. Second Cause of Action:

### Illegal Solicitation of Persons on the National Do Not Call Registry

68. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

69. Defendants' contact of Plaintiffs' cellular phone number on the National Do Not Call Registry constitutes a violation of 47 U.S.C. § 227(c) and 47 C.F.R. §64.1200(c).

70. As a result of Defendants' negligent violations of 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(5)(B).

71. As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $1,500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(5)(B) and 47 U.S.C. § 227(c)(5)(C).

> "The fact that the [TCPA] includes separate provisions for statutory damages in subsections (b) and (c) suggests that a plaintiff could recover under both.... Additionally, the two private-right-of-action provisions contain significant textual differences, indicating that they are distinct provisions to be treated independently.... The two subsections, moreover, target different harms.... By enacting separate private-right-of-action provisions, each including a statutory damages provision, Congress evidenced its intent that a person be able to recover for the telemarketer's failure to institute the minimum procedures for maintaining a do-not-call list as well as the additional harm of the call being automated. We therefore conclude that a person may recover statutory damages of $1500 for a willful or knowing violation of the automated-call requirements, § 227(b)(3), and $1500 for a willful or knowing violation of the do-not-call-list requirements, § 227(c)(5)—even if both violations occurred in the same telephone call."

*Charvat v. NMP, LLC*, 656 F.3d 440, 448-9 (6th Cir. 2011).

72. Plaintiffs are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## VIII. Relief Requested

73. WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs the following relief against Defendants:

74. As a result of Defendants' violations of 47 U.S.C. § 227(b), Plaintiffs seek $92,520,000.

75. As a result of Defendants' violations of 47 U.S.C. § 227(c), Plaintiffs seek $35,016,000.

76. Plaintiffs seek costs pursuant to 28 U.S.C. § 1920.

77. Plaintiffs seek judgment interest pursuant to 28 U.S.C. § 1961.

78. Plaintiffs seek injunctive relief prohibiting such conduct in the future.

79. Any other relief the Court may deem just and proper.

## IX.  Jury Demand

80. Plaintiffs request a trial by jury of all claims that can be so tried.

Date: 1/30/2020                              Respectfully submitted,

                                                             /s/ *Nicole Lewis*
                                                             Nicole Lewis
                                                             Attorney for Plaintiffs